Filed 7/15/15  In re M.J. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.J. et al., Persons Coming Under the Juvenile Court Law. | B260210 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.J.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK79009) |

Appeal from the orders of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Affirmed and remanded with directions.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother K.J. appeals from the jurisdictional findings under section 300, subdivision (b) of the Welfare and Institutions Code,[1] as well as the dispositional findings and orders under section 361, subdivision (c), for her three children. Father is not a party to this appeal. Mother contends the juvenile court's finding that her unresolved mental and emotional problems endangered the children's physical health and safety, and the court's dispositional order removing the minors from her custody, are not supported by substantial evidence. Mother also contends that the Los Angeles County Department of Children and Family Services (Department) failed to comply with the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) because it did not investigate the children's possible Indian ancestry, and failed to provide notice to the Bureau of Indian Affairs (BIA). We affirm, finding that substantial evidence supports the jurisdictional and dispositional orders, but remand for compliance with ICWA.

## BACKGROUND

On September 19, 2014, mother and her children, then nine-year-old M.J., seven-year-old Ke.J., and six-year-old Ka.J., came to the attention of the Department when it received a referral alleging general neglect and emotional abuse. Mother had failed to pick up the children from school, and they had been left unsupervised for hours. The children were released from school at 2:50 p.m., watched a movie in a teacher's classroom until 4:45 p.m., but were not picked up. School personnel attempted unsuccessfully to call mother. Around 6:00 p.m., the school principal drove the children home, but mother did not answer the door. Therefore, the principal drove the children back to the school. The school contacted mother's neighbor, a former school district employee, who knocked on mother's door until she awoke. The neighbor believed mother was intoxicated.

Eventually, mother arrived at the school to pick up her children, but the after school program coordinator did not want to release the children to mother because she appeared to be under the influence of alcohol. However, mother took the children and

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

left school grounds.  School staff reported the incident to police, and provided the police with mother's home address.

Police arrived at mother's home before mother and the children.  When mother arrived at home, she appeared "intoxicated and unstable," and was difficult, agitated, and upset.  Mother was arrested for public intoxication; however, those charges were later dismissed. The children were detained.

A Department social worker interviewed mother at the police station.   Mother denied using drugs or alcohol, or having a mental health history.  Mother stated that she spoke to Ms. Young at the children's school, who informed her that the children could watch a movie in her classroom after school. The children then called mother to pick them up. Mother stated that father, Matthew J., was "irrelevant," and not part of the children's lives.  When the Department asked mother about the children's possible Indian heritage, she stated that the children are "part Indian," but she did not know what tribe.

The social worker did not speak to the children because they were sleeping in another part of the police station, but noted that they appeared "healthy, well cared for, and were appropriately dressed."  There were no obvious marks or bruises on their bodies.  The police and social worker transported the children to maternal aunt's house for placement.

The following day, a Department social worker interviewed maternal aunt, who denied having any concerns of abuse or neglect of the children while in mother's care. Maternal aunt also denied that mother suffered from any alcohol or drug issues.

The children acknowledged they were fed three meals per day and denied any abuse or drug use in the home. They denied that mother ever hit them or inappropriately touched them.  They felt safe with mother.  M.J. stated that she and her sisters visited father every other weekend, and that she likes visiting father.  The children all stated that they are not part of an after school program. According to M.J. and Ke.J., the children all go to the library at Virginia Park and do homework after school.  Ka.J. stated that she and her sisters go to the park after school.  They all said they would call their mother on her cell phone, and she would pick them up.  The children denied that an adult supervised

them during this time.  However, M.J. stated that mother is "always" there to pick them up.

The family has a history with the Department.  In August 2009, mother was arrested for a domestic violence incident involving father.  The family was referred to the Department for general neglect and emotional abuse.  The referral was substantiated and resulted in a dependency case from August 25, 2009, through September 23, 2011.  The family reunified and the case was closed with a family law order giving mother sole physical and legal custody of the children.  In the earlier case, the court found Matthew J. to be the presumed father of the children. Also in that case, the court found that ICWA did not apply, and did not order notice to any tribe or the BIA.

Previously, in June 2006, an emotional abuse referral was substantiated against father due to domestic violence against mother.  Mother obtained a restraining order against father.  In April 2008 and September 2009, the family was referred to the Department for emotional abuse and general neglect, respectively.  Those referrals were closed as inconclusive.

Mother herself was a ward of the court from January through April 1987.  She was ultimately reunified with her family.

On September 24, 2014, the Department filed a section 300 petition, under subdivision (b), on behalf of M.J., Ke.J., and Ka.J. alleging the children were at risk of harm due to mother's history of substance abuse, her current abuse of alcohol, her public intoxication while the children were in her custody, and her willful neglect and failure to properly supervise the children after school resulting in the children being left unsupervised for extended periods of time.

The detention hearing was held on September 24, 2014.  Mother filed a Parental Notification of Indian Status, indicating, "I have no Indian ancestry as far as I know." When the court asked mother whether father had any Native American ancestry, mother replied "it's possible, Your Honor."  The court stated that it found no reason to believe that the case involved ICWA as to mother.  However, it did not make any findings as to father, as he had not yet been located.  The court ordered the parents "to keep the

4

Department, their Attorney and the Court aware of any new information relating to possible ICWA status." The court found father to be a presumed father. The court found a sufficient prima facie case for detaining the children, ordered that mother's visitation be monitored, and that mother be provided with drug testing referrals.

The Department's investigation revealed concerns about mother's mental health. Therefore, on October 10, 2014, a first amended petition was filed, which included new allegations that mother suffered from unresolved mental and emotional problems. Specifically, the amended petition alleged that under section 300, subdivision (b), "The children['s] . . . mother . . . has unresolved mental and emotional problems including, but not limited to mother being unresponsive while staring at her apartment building and apartment walls for hours in the presence of her children. Further, the children's mother repeatedly made comments about God and the devil which frightened the children. The child [M.J.] contacted a family member who then contacted 911 and on or about August 19, 2014, the children's mother was assessed by the PET team and taken by ambulance to the hospital. The children's mother was hospitalized for three days for mental and emotional problems. Such mental and emotional problems on the part of the mother endangers the children's physical and emotional safety and places the children at risk of physical and emotional harm and damage."

The Department's October 16, 2014 jurisdiction/disposition report included additional information. On October 7, 2014, the Department investigator interviewed M.J. at school. When asked what she understood about the Department's involvement with her family, M.J. responded, "well, my mom let us watch a movie at my sister's teacher's class." After the movie, M.J. tried to call mother, but mother's phone "did not ring or do anything. It was off. It didn't go to voicemail and we didn't leave a message." According to M.J., when mother does not call her after school, the plan is to walk home, but on that day "the lady didn't let us walk home." M.J. stated that mother eventually showed up at school and walked her and her sisters home. When asked how mother appeared, she stated "My mom didn't say anything about why she wasn't there. She said

5

she was asleep." When asked if her mother seemed okay as they walked home, M.J. replied, "Yes." M.J. stated that mother does not drink alcohol or use drugs.

When the Department investigator asked M.J. whether mother had been recently hospitalized, M.J. said mother had been hospitalized, but she did not know why. Mother was hospitalized sometime around August 22, 2014, "because something was happening. She said stuff about God and the devil." M.J. had called maternal grandmother, who then called an ambulance. M.J. called maternal grandmother because mother was "just staring at the apartment building. She did that for like an hour." M.J. told her grandmother that mother "did that for four days" and the day before M.J. called maternal grandmother, mother had been "yelling about God and the devil." On that day, when M.J. tried to wake mother up, mother was "sleeping and . . . shaking and saying things." M.J. said that on the "first day, [mother] was staring at the wall in the house and then she went outside the building and was staring." Mother "was talking about the devil, and the devil is a liar, and that God had to lie to her to get back to reality." M.J. and her sisters started crying because they were scared of mother's behavior. M.J. said that mother was in the hospital for three days. When mother was released, she was normal. The children stayed with maternal grandmother during mother's hospitalization, and the whole family stayed with maternal grandmother for three weeks following mother's release.

The Department investigator also interviewed Ke.J. When asked whether mother had been hospitalized, Ke.J. said yes, but she "forgot" what had happened. When asked if mother had been acting "different," Ke.J. stated, "a little bit." When asked if mother was talking about God and the devil, Ke.J. stated, "Um, Yeah. I forgot." Ke.J. stated that mother was "standing outside closing her eyes . . . staring at the wall" when her sister called maternal grandmother.

Ka.J. was also interviewed. Ka.J. reported that mother "sleeps for a long time," and when she wakes up, "she stares for a long time." She remembered mother talking about God and the devil and said it "scared [her] and made [her] cry." Mother "went to the hospital . . . for three days in a row, she was talking about God . . . ."

6

Mother was interviewed on October 8, 2014. Mother graduated from high school in 2003, and obtained her Associates degree in Child Development from Southwest College. Mother married father in 2005, but they have been separated since 2008. Mother was adamant that she was falsely arrested and denied being intoxicated. Mother believed the Department made false allegations against her and "[t]he history of [her] apartment is that everyone who has lived [there] has had a case with" the Department. Mother felt like she was "targeted."

Mother denied having a history of substance abuse. On September 19, 2014, mother gave her daughters permission to stay at school to watch a movie in Ms. Young's class. The children were supposed to call mother to pick them up, but she never got a call from them. Mother got ready to meet the girls at school, because the school was hosting a "Bingo night" and they planned on attending. She left for the school at approximately 6:00 p.m. Mother then picked up her children at school and walked them home.

Mother denied that school officials called her on September 19 to pick up the children. Mother pulled up her phone records on the computer, and when the Department investigator pointed out two incoming calls, mother stated "I don't know what is going on. This just showed up on here. This was not here before." Mother claimed that her phone bill had "changed" since the last time she reviewed it. Mother's statements troubled the Department investigator.

When asked if she had ever been hospitalized, mother became defensive, and said that she did not want to answer. She then volunteered that she had "never been hospitalized for drugs and I have never been hospitalized for mental health issues." When asked for a simple yes or no answer about whether she was hospitalized in August 2014, mother said "It wasn't for drinking." Mother ignored many of the investigator's questions about why she was hospitalized. When confronted with the children's statements that she had been hospitalized, mother did not believe the children had said so. When asked again why she was hospitalized, mother responded, "I don't have a history of mental health issues. I have no diagnosis, I am not taking any medication, and I have no convictions for anything." Mother then stated, "I wasn't feeling well." When pressed

7

for more information, mother said that her hospitalization was not relevant to the allegations in the petition. The Department investigator advised mother that the petition could be amended to include mental health allegations, and that the investigator had concerns about her mental health. Mother said, "I do not want my mental health exposed. There are HIPPA laws and I do not have to have my medical history be public knowledge."

Catherine Taylor, the afterschool program coordinator at the children's school, did not know the children before the September 19 incident, because they were not enrolled in an afterschool program. On September 19, she noticed the girls sitting in front of the school at 6:15 p.m. Ms. Taylor and the school principal tried to call mother and maternal grandmother. Mother's neighbor, a former district employee, was able to contact mother at mother's home, but reported that mother appeared "unstable." When mother eventually arrived at school to pick up her children, Ms. Taylor could smell alcohol on her. Mother's hair and clothes were disheveled. Mother was "unapologetic" and demanded that the children be released to her. Ms. Taylor made clear she would not release the children to mother, but mother left with the children while Ms. Taylor was on the phone with the police.

Ms. Taylor told the Department investigator that the "the girls, they are beautiful girls and were well dressed. Maybe it was an off day. The kids didn't look neglected. They were very well-mannered. Their hair was beautiful and their clothes were nice."

Mother later confronted Ms. Taylor, and told her that she never received any calls from her or the principal on September 19. After the September 19 incident, mother called Ms. Taylor's personal cell phone. According to Ms. Taylor, the only way mother would have that number was because Ms. Taylor had used her personal phone to call mother on the 19th.

School principal Wendy Wax-Gellis reported that mother was coming by the school "asking everyone questions and acting hostile." Ms. Wax-Gellis reported that mother had been recently hospitalized, and the children stayed with grandmother during this time, and were repeatedly late to school.

8

Maternal aunt believed the September 19 incident resulted from a misunderstanding, and that school officials were lying about what happened. Mother was "an amazing mother" and the "kids are clean, eat and are fed." Maternal aunt refused to comment on mother's recent hospitalization. She had no information about father.

Mother's neighbor, Paula White, did not believe mother suffered from a drug or alcohol problem. She was concerned that mother "has some form of high intelligence that is more like a mental health issue." She did recall an ambulance and Psychiatric Emergency Team (PET) coming to mother's home in the beginning of September because mother had a "breakdown." The children were present and were "screaming."

Mother's former childcare provider, Celia Fisher, told the Department investigator that she believed mother had been hospitalized for 72 hours by the PET team. She was not sure of mother's current mental state. She believed mother to be a "really good mom."

Mother's neighbor, Dana Rogers, had heard that mother was recently hospitalized.

Mother did not know father's whereabouts, and the Department Investigator was unable to interview him for the jurisdiction/disposition report. Mother believed the allegations against her were false, and that the case should be "dropped."

The Department was concerned that mother was having unsupervised contact with the children, notwithstanding the court's order that her visitation be supervised. Mother visited with the children at maternal grandmother's house daily, and Ka.J. reported that she went to the store with mother. The Department was concerned that mother discussed the case with the children.

A September 19 police report was appended to the Department's report, and noted that when police arrived at mother's house, she was disheveled, her speech was irregular and slurred, and she smelled strongly of alcohol. She was uncooperative and refused to follow the responding officers' instructions.

The Department completed a due diligence report for father. The Department was able to locate several possible addresses for father. However, father's whereabouts remained unknown.

9

In an October 14, 2014 last minute information for the court, the Department indicated that it interviewed one of the arresting officers about mother's mental health. The officer reported that mother seemed "off." Ultimately, no criminal charges were filed against mother in connection with her September 19 arrest.

## 1. The Adjudication Hearing

The adjudication hearing commenced on October 16, 2014.[2] The Department's reports were admitted into evidence, and the Department rested its case on the reports.[3] As the parties were discussing how the trial would proceed, mother voiced dissatisfaction with the witnesses that her attorney intended to call. A *Marsden*[4] hearing was held. Following the *Marsden* hearing, mother repeatedly interrupted the court, and ultimately had to be removed from the courtroom by the bailiff.

Mother called the Department Investigator, Jamie Hein, to testify. Ms. Hein testified that prior to the September 19 incident, mother did not have any arrest record for alcohol. Mother's neighbors and the children also had never seen mother drunk. The investigator admitted that she did not know where mother was recently hospitalized, and that there was no evidence of previous hospitalizations. There was also no evidence mother received a diagnosis or was prescribed medication in connection with her hospitalization.

The investigator did not believe the children could be safely returned to mother until she received a mental health evaluation, and until the Department was able to review her medical records from her hospitalization. The investigator was unable to

---

[2] The adjudication hearing was continued a number of days because one of mother's witnesses was ill.

[3] Mother filed objections under section 355 to the hearsay statements contained in the Department's detention report. Specifically, she objected to statements of the "reporter," neighbor, and Ms. Taylor in the detention report. The juvenile court sustained the objections.

[4] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

10

obtain mother's medical records from the Department of Mental Health because mother refused to sign a release.

M.J. testified that on September 19, she and her sisters tried to call their mother to pick them up from school, but were unable to reach her. It made M.J. sad. M.J. remembered mother going away in an ambulance. That day, mother told M.J. she felt sick, so M.J. called maternal grandmother, who called an ambulance. M.J. was not scared. She and her sisters stayed with maternal grandmother until mother was "better." She wanted to return home with mother, and was not afraid of her.

The Department informed the court that it wanted to introduce evidence of mother's odd behavior following the October 16 hearing. The court stated its view that additional witnesses were not necessary, as the court had ample opportunity to observe mother's behavior in court. The court recalled that a deputy removed mother from the courtroom, and the court had to leave the bench out of "fear of my safety." The Department argued that after the judge left the courtroom, mother refused the deputies' commands to leave the courtroom and had to be handcuffed and detained.

The court sustained the allegation concerning mother's mental health and dismissed the other allegations. The court moved to disposition, and expressed concern that mother was doing nothing to address her mental health, and that her untreated mental health issues would put the children at risk.

The court ordered the children removed, and found that reasonable efforts to avoid removal were made. The court ordered monitored visitation, and that mother undergo a psychological assessment and participate in mental health counseling.

## DISCUSSION

### 1. Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings

Under section 300, subdivision (b), the juvenile court may adjudge a child to be a dependent of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . due to the parent's . . . mental illness." Section 300, subdivision (b) requires: "(1) neglectful

11

conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. . . . The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916, citations omitted.)

Mother contends there was no evidence that she was diagnosed with a mental illness, and that section 300, subdivision (b) "should be interpreted to require a diagnosis of a mental disorder, by a licensed professional." Mother also contends that the risk of harm to the children was too speculative to support jurisdiction. (See *In re James R.* (2009) 176 Cal.App.4th 129, 137.) We disagree. When jurisdiction is based on a parent's mental illness, expert evidence of mental illness is *not* required. (*In re Khalid H.* (1992) 6 Cal.App.4th 733, 736.) Mother cannot frustrate the court's and Department's efforts to protect the children by refusing to release her medical records, and then claim that insufficient evidence supports jurisdiction. There was substantial evidence that mother had recently suffered a significant mental health episode which required hospitalization, and that she was in denial and had made no subsequent attempts to address her mental health issues. Mother's condition during the episode frightened the children, who had no other appropriate supervision at the time. There was also evidence that mother's mental health issues persisted, based on her erratic behavior in the courtroom and her paranoid belief that she was being targeted by the Department. Therefore, there was ample evidence that mother suffered from a mental health problem sufficient to support jurisdiction under section 300, subdivision (b), and that mother's

12

unresolved mental health issues posed a very real risk of harm to the children. (*In re Khalid H.*, at p. 736.)

**2. Substantial Evidence Supports the Juvenile Court's Dispositional Findings**

Mother contends there was insufficient evidence that the children could not safely be returned to her care, and that there were less drastic alternatives to removal. A child may not be removed from a parent or guardian unless there is clear and convincing evidence of "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) Section 361, subdivision (d) requires the juvenile court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based." A juvenile court's removal order is reviewed under the substantial evidence standard of review, notwithstanding the evidentiary standard used at trial. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; see also *In re E.B.* (2010) 184 Cal.App.4th 568, 578 ["The clear and convincing standard was adopted to guide the trial court; it is not a standard for appellate review. [Citation.] The substantial evidence rule applies no matter what the standard of proof at trial."].)

The juvenile court was made aware of alternatives to removal, such as requiring mother to submit to a mental health evaluation, and providing mother with wraparound services which would include unannounced visits by the Department. The court was not satisfied that any of these measures could adequately protect the children given the severity of mother's recent mental health episode, and her failure to acknowledge or address the problem. Mother was uncooperative with the Department, and continued to display disturbing behaviors. These circumstances suggested that the children were at a very real risk of harm. Therefore, substantial evidence supports the juvenile court's order.

13

**3.     ICWA**

Lastly, mother contends that the Department failed to comply with the inquiry and notice provisions of ICWA after mother informed the Department and the court of possible Indian heritage through father.  If the juvenile court or the social worker "knows or has reason to know that an Indian child is involved," the social worker must "make further inquiry regarding the possible Indian status of the child . . . by interviewing the parents . . . and extended family members . . . and contacting . . . any other person that reasonably can be expected to have information regarding the child's membership status or eligibility." (Welf. & Inst. Code, § 224.3, subd. (c); see also Cal. Rules of Court, rule 5.481(a)(4).)  The duty under the ICWA to inquire whether a dependent child is or may be an Indian child is affirmative and continuing.  (Welf. & Inst. Code, § 224.3, subd. (a).)

When a juvenile court "knows or has reason to know that an Indian child is involved" in a dependency case, it must give the child's tribe notice of the proceedings and its right to intervene.  (25 U.S.C. § 1912(a); Welf. & Inst. Code, §§ 224.2, subd. (a), 224.3, subd. (d); Cal. Rules of Court, rule 5.481(b); see also *In re Damian C.* (2009) 178 Cal.App.4th 192, 196.)  " 'If the identity or location of . . . the tribe cannot be determined,' the notice need only be given to the BIA." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1157, quoting 25 U.S.C. § 1912(a).)

 "The determination of a child's Indian status is up to the tribe; therefore, the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement.  [Citations.]" (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 848.)  "A hint may suffice for this minimal showing." (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 549; see also *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1407 [a parent's statement that a child "might" belong to a certain tribe is sufficient to trigger ICWA notice].)

Mother said the children's father might have Indian ancestry.  Consequently, the Department had an obligation to inquire regarding the children's possible Indian ancestry by interviewing "extended family members . . . and . . . any other person that reasonably can be expected to have information concerning the child's membership status or

14

eligibility." (§ 224.3, subd. (c).) "If the inquiry leads the social worker or the [juvenile] court to know or have reason to know an Indian child is involved, the social worker must provide notice. (§§ 224.3, subd. (d), 224.2, subd. (a)(5)(A)-(G).)" (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539.)

We recognize that at the detention hearing, the juvenile court reserved making any determination about ICWA's applicability as to father, and at the time of the jurisdictional hearing, father's whereabouts remained unknown. However, the Department did not make any further ICWA inquiries concerning father. To forestall any appellate issues with ICWA compliance in the future, we remand with instructions that the juvenile court order the Department to comply with ICWA's inquiry and notice requirements as to father's possible Indian ancestry. At the very least, if no information about possible tribal affiliations is discovered, notice to the BIA is required.

## DISPOSITION

The jurisdictional findings and dispositional orders are affirmed. The juvenile court is directed to order the Los Angeles County Department of Children and Family Services to comply with ICWA inquiry and notice requirements.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

15